**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Joe Bondick, individually and on behalf of all others similarly situated, | 1:21-cv-06132 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Ricoh Imaging Americas Corporation, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.  Ricoh Imaging Americas Corporation ("defendant") manufactures, labels, markets, and sells a digital single-lens reflex camera ("DSLR") identified as the K-50 under the Pentax brand ("Product").



2.  The camera was designed, engineered and manufactured with certain parts that, in relatively high percentages of time, fail through normal use, result in exposure issues, described

as "black picture problems."

3.      The result is a non-functional camera, rendering any accessories, such as lens sets and cases, similarly useless.

## I.    APERTURE FAILURE IN K-50 CAMERA

4.      The cause lies with the aperture, the opening in a lens through which light enters a camera.



Aperture is like the "pupil" for your camera system, which can open and close to change the amount of light that passes through. Note the nine blades in this lens, which form a *diaphragm* to block any light that tries to pass, except through the center.

5.      The shrinking or enlarging of camera's aperture allows more or less light to reach inside the camera's sensor which affects an image's brightness or exposure.

6.      A wider aperture results in a brighter photo, and a smaller one makes a picture dark.

7.      The black pictures are caused by failure of parts within the Diaphragm Control Block ("DBC"), which controls the aperture.



8.      One of these parts is the solenoid, which is a coil of wire through which a current

will flow and produce a magnetic flux to push or pull a rod called an armature.



Shape of the Solenoid Shutter. Left : Shutter Motor is Opened. Right : Shutter Motor is Closed

9.     The armature is a small part in the solenoid that looks like a horseshoe.



10.     The solenoid fails because of the ratio of copper to alloy used in the armature.

11.     The high amount of alloy relative to copper used in the Product's armature renders it more susceptible to deterioration, than if it used the costlier and sturdier copper.

12.     The excess amount of alloy used in the armature prevents the Product to function without incident throughout its normal use-life.

13.     When the armature degrades, it prevents the proper flow of the electric current, causing the lens aperture to stop at the "down" point, rather than to the opening set by the meter.

14.     This is exacerbated by the armature's surface finish and the plastic casing's thickness, which impedes the electric current after the armature has been worn down. worn off.

15.     These issues have been heavily documented by online forums from K-50 owners.



16.     A comparable camera from a competitor, the Nikon D 700, uses an armature with more copper, less alloy, and a thinner plastic covering.



17.     These characteristics allows for easier flow of electric currents, which means the black pictures experienced by K-50 users will not occur.

## II.     APERTURE FAILURE IS WIDESPREAD

18.     A survey of K-50 users showed that almost 27% of respondents experience the aperture block failure, an exceedingly high failure rate compared to industry norms.

4

Table 1 presents a summary of the results for each camera:

|  |  | K-S2 | K-S1 | K-500 | K-50 | K-30 | Totals |
|---|---|---|---|---|---|---|---|
| Aperture Block OK |  | 19 | 8 | 6 | 107 | 165 | 305 |
| Aperture Block Failed |  | 3 | 0 | 5 | 39 | 96 | 143 |
| Fate | Not Repaired | 1 | 0 | 2 | 18 | 64 | 85 |
|  | Repaired At Cost | 0 | 0 | 0 | 5 | 20 | 25 |
|  | Repaired Under Warranty | 2 | 0 | 3 | 16 | 12 | 33 |

Table 1: Failure rates by camera

19.    Over ninety percent of K-50 aperture failures occur between 21 and 36 months after purchase.



Chart 5: histogram of age of K-50 bodies with failed aperture blocks

20.    The aperture begins to degrade after the Product is purchased and varies based on usage conditions.

21.    About 6.8% of all K-50s will fail within the warranty period, several times higher than industry norms.

22.    A much larger percentage fail outside of the warranty period due to the degradation of the aperture materials.

## III.   DEFENDANT IS AWARE OF THE ISSUE

23.    Numerous customers have taken to social media, YouTube, Reddit, and other internet outlets to seek help from other K-50 users, in light of Defendant's failure to address this issue.

24.    At the pentaxforums.com website, K-50 owners created an entire section entitled

"Pentax Aperture Block Failure."

25. The initial aperture malfunction appears in social media in 2014 about two years after the first K-30 model was introduced.

26. The first reports of the aperture failure appeared online in 2014, one year after the Product's release.

27. New reports on social media, pentaxforums.com, and elsewhere, continue to appear through 2021.

28. The images below are from YouTube videos, where users share information on "How to fix Pentax K-50 (K-30) aperture."[1]

How to fix Pentax K-50 (K-30) aperture

40,255 views • Jun 24, 2017

how to fix Pentax K50 and K30 with aperture problem

47,347 views • Jan 23, 2017         341

How to fix Pentax K-30 (K-50) aperture solenoid (Black pictures problem)

2,490 views • Feb 2, 2020

Thank you so much for this ! I would never have DARE to open my Pentax K-30 without your video. I was so desesperate with this "black or dark picture issue". When I realize it was "easy" and fast, I did it and it works fine now !!! However, I realize with in a comment below that position of the autofocus selector was wrong when I rebuild. I need to dismantle a second time for a perfect fix.

Just did it. Worked like a charm. Really excited about having my K-50 running smooth again. Thank you so much.

[1] http://www.youtube.com/watch?v=dzGbyZHPknQ (Start at 7:00); https://www.youtube.com/watch?v=1ZZoTUQvwBI (Start at 11:20); https://www.youtube.com/watch?v=d3tmq1Dx_mI (Start at 3:00).

It works! I have a K30 model, so i had to find an extra movie with the cover dissasembly, but the repair itself really works. I am afraid of using WD 40 or other greasystuff inside the camera, i have used the 2500 sand paper. Thanks for sharing your experience and expertise.

Thank you so much for making this video. You gave me the confidence to do the same repair to my own K50, and it worked! Great job 😄

jan dlouhý 7 months ago
greate video, thank you

29.     All the videos have been viewed tens of thousands of times, and are accompanied by comments from grateful K-50 users.

Thank you so much for this ! I would never have DARE to open my Pentax K-30 without your video. I was so desesperate with this "black or dark picture issue". When I realize it was "easy" and fast, I did it and it works fine now !!! However, I realize with in a comment below that position of the autofocus selector was wrong when I rebuild. I need to dismantle a second time for a perfect fix.

Just did it. Worked like a charm. Really excited about having my K-50 running smooth again. Thank you so much.

It works! I have a K30 model, so i had to find an extra movie with the cover dissasembly, but the repair itself really works. I am afraid of using WD 40 or other greasystuff inside the camera, i have used the 2500 sand paper. Thanks for sharing your experience and expertise.

Thank you so much for making this video. You gave me the confidence to do the same repair to my own K50, and it worked! Great job 😄

jan dlouhý 7 months ago
greate video, thank you

30.     Some of the comments are from K-30 users, which is expected, because this camera is also made by Defendant and similar to the K-50.

31.     Defendant acknowledged the "countless stories" of aperture failures by K-50 users

at pentaxforums.com:

In the US, the standard 1-year Pentax manufacturer's warranty, which is included with the purchase of any new camera or lens, can seem a bit short at times. We've heard countless stories of users having to send their cameras in for service shortly after their warranty periods had expired, and as you may know, repairs can sometimes end up being quite costly!

32.    Defendant acknowledged that it "heard countless stories of users having to send their cameras in for service shortly after their warranty periods had expired."

33.    The result was Defendant's "free" modified extended warranty for the K-50.

34.    However, Defendant charged $19.95 plus shipping and handling, and this offer was not communicated to Plaintiff and almost all members of the proposed class.

35.    These issues are prevalent enough to have spawned a cottage industry dedicated solely to the repair of faulty aperture control systems on the Pentax K-series.

36.    A company in California set up a website called "Pentaxcamerarepair.com," claiming to provide "Aperture Repair Service For Select Pentax Models," including the K-50, for $150.

37.    As an alternative, K-50 owners can attempt to repair the camera themselves by watching YouTube videos or sending it to Defendant for a costly repair.

38.    Correcting the aperture failure requires skills the average user, such as Plaintiff, does not possess.

39.    Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

40.    By selling a Product with these issues, Defendant gained an advantage against other companies, and against consumers seeking to purchase a product that functioned adequately through its normal use-life and did not suffer black picture problems.

8

41.     The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

42.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

43.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

44.     The Product is sold for a price premium compared to other similar products, between $630 to $900 purchased new and between $250 and $480 when purchased used, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

45.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

46.     The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

47.     Plaintiff Joe Bondick is a citizen of Illinois.

48.     Defendant Ricoh Imaging Americas Corporation, is a Delaware corporation with a principal place of business in Parsippany, Morris County, New Jersey.

49.     Plaintiff and defendant are citizens of different states.

50.     Defendant transacts business within this District through the sale of the Product directly to retailers, like Best Buy, and directly to consumers from the internet.

51.     Venue is in this District because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

52.     Venue is in the Eastern Division in this District because a substantial part of the

events or omissions giving rise to the claim occurred in Cook County, i.e., Plaintiff's purchase and use of the Product and his experience and awareness of the issues described here.

Parties

53. Plaintiff Joe Bondick is a citizen of Elmwood Park, Cook County, Illinois.

54. Plaintiff bought the Product at Camera Craft in Rockford, Illinois, in late 2014, for approximately $700.

55. Defendant Ricoh Imaging Americas Corporation, is a Delaware corporation with a principal place of business in Parsippany, New Jersey, Morris County.

56. Defendant is a subsidiary of the Japanese conglomerate Ricoh.

57. Plaintiff expected the camera would function without deterioration of the aperture which resulted in black pictures.

58. Plaintiff's claims are subject to equitable tolling and equitable estoppel.

59. Defendant is estopped from asserting a statute of limitations defense.

60. Plaintiff was diligent in commencing this action within a reasonable time after the facts giving rise to the estoppel ceased.

61. Plaintiff was delayed in filing this action due to Defendant's wrongful conduct.

62. Plaintiff was induced by fraud, misrepresentations, omissions and/or deception to refrain from filing this action sooner.

63. Defendant's fraudulent concealment caused Plaintiff to lack knowledge of his causes of action.

64. Plaintiff did not have enough information to commence the action sooner because Defendant failed to disclose, and concealed, that the cause of the issue was due to the lower quality materials used in the aperture.

65.    Plaintiff's claims accrued when his K-50 suffered from the exposure issues caused by the defective aperture, which was not latently defective but functioned properly.

66.    This occurred approximately two to three years ago.

67.    Defendant refused to repair or replace Plaintiff's Product unless he paid at least $200 merely to evaluate it, which he did not have or did not feel was a fair price to not even assure him it would fix the Product.

68.    Plaintiff contacted and/or attempted to contact Defendant to remedy these issues but was not successful in achieving a resolution.

69.    Defendant's post-sale handling of Plaintiff's warranty claim and inquiry was deceptive and misleading because he was told, in part, by Defendant or its authorized representatives that the issue could possibly be fixed by remedial action such as resetting the camera and that what he experienced was an isolated occurrence.

70.    Defendant's post-sale conduct, including  failure to cover the repair or replacement of the aperture assembly, was deceptive and misleading, since Defendant knew the issue would affect a fixed percentage of all K-50s, and that many users would have this occur after the warranty expired.

71.    Plaintiff was not aware of the exposure issue within the time permitted by any applicable warranty, because the aperture did not fail during the warranty's duration.

72.    Defendant knew the lower-quality materials used in the aperture control block would degrade, causing the issue to occur at unpredictable intervals.

73.     Defendant knew that the failure of Plaintiff's K-50 was due to its own actions in selling a product with lower quality materials that would experience high failure rates, at uncertain periods, not based on how long a user owned the camera, or how many pictures were taken.

74. Defendant knew or should have known of the issue through complaints they received or were informed of.

75. Defendant failed to notify merchants and distributors of the issue described here and no notice was provided to Plaintiff prior or after his purchase.

76. Defendant has not remedied the issue and continues to sell the Product.

77. Plaintiff would not have purchased the Product if he knew the representations and expectations of its reliability and stable functioning were false and misleading.

78. Plaintiff chose between the Product and other similar products which did not misrepresent their attributes and/or lower-priced products.

79. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading representations, statements and omissions.

80. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's capabilities are consistent with a normal functioning camera.

81. Plaintiff relied on the brand name of Pentax to expect a camera which functioned capably throughout its normal use-life and was represented by Pentax as so functioning.

82. Plaintiff bought the Product at or exceeding the above-referenced price.

83. Plaintiff would not have purchased the Product if he knew the representations were false and misleading or would have paid less for them.

84. Plaintiff chose between Defendant's Product and similar products represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

85. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading representations, i.e., its sale to consumers.

86.     Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's representations are consistent with its ability to function.

87.     Plaintiff is unable to rely on the labeling of not only this Product, but other cameras, because he is unsure of whether their cameras will function adequately.

88.     Plaintiff wants to purchase a DSLR camera because he likes using this type of camera.

Class Allegations

89.     Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged.
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Texas, Delaware, Montana, Kentucky, Indiana, North Dakota, Rhode Island, Michigan, Virginia, North Carolina, Kansas, Wyoming, and Delaware, who purchased the Product during the statutes of limitations for each cause of action alleged.

90.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

91.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

92.     Plaintiff is an adequate representative because his interests do not conflict with other members.

93.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

94.     Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

95.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

96.     Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

97.     Plaintiff incorporates by reference all preceding paragraphs.

98.     Plaintiff and class members desired to purchase a product that functioned adequately through its normal use-life and did not suffer black picture problems.

99.     The Illinois Consumer Fraud and Deceptive Business Practices Act provides protection for consumers purchasing products like Defendant's Product, and states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . are hereby declared unlawful

815 ILCS 505/2.

100.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

101.   Defendant misrepresented the Product through its sale to consumers, statements, omissions, ambiguities, half-truths and/or actions.

102.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

103.   Plaintiff relied on the representations that the Product functioned adequately through its normal use-life and did not suffer black picture problems

104.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

105.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

106.   Defendant intended that plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

107.   As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

108.   In addition, defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,<br/>Implied Warranty of Merchantability and<br/>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq.</em>

109.   The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it functioned adequately through its normal use-life and did not suffer black picture problems.

110.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

111.   This duty is based on Defendant's outsized role in the market for this type of Product, sold under the well-respected Pentax brand.

112.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

113.   Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums, and Defendant acknowledged these issues to consumers.

114.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and was not merchantable because it was not fit to pass in the trade as advertised.

115.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breach of Contract</u>

116.   Plaintiff entered into a contract with Defendant when he purchased the Product.

117.   Plaintiff contracted for a camera which functioned adequately through its normal use-life.

118.   Defendant breached the contract when the camera suffered the issues described herein, and it did not cure the breach.

119.   Plaintiff suffered damages in the form of an inoperable camera as a result of Defendant's breach.

<u>Negligent Misrepresentation</u>

120.   Defendant had a duty to truthfully represent the Product, which it breached.

121.   This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, as the custodian of the Pentax brand.

122.   The representations took advantage of consumers' cognitive shortcuts made at the

point-of-sale and their trust in defendant, a preeminent camera manufacturer.

123.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

124.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

125.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it functioned adequately through its normal use-life and did not suffer black picture problems.

126.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provide it with actual and/or constructive knowledge of the falsity of the representations.

127.  Defendant conceded the issues with the camera through its attempt at an extended warranty, though this was not communicated to Plaintiff.

128.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations that it would function adequately.

<u>Unjust Enrichment</u>

129.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

  1.  Declaring this a proper class action, certifying plaintiff as representative and the

undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   November 17, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com